


FILED
Mar 08 2019, 9:25 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE

# Indiana Supreme Court

Supreme Court Case No. 15S01-1611-CR-571

## Marcus Zanders,
*Appellant (Defendant)*

–v–

## State of Indiana,
*Appellee (Plaintiff)*

Argued[1]: September 26, 2018 | Decided: March 8, 2019

Appeal from the Dearborn Superior Court, No. 15D02-1502-F3-3
The Honorable Sally A. McLaughlin, Judge

On Remand from the Supreme Court of the United States, No. 17-166

**Opinion by Chief Justice Rush**
Justices David, Massa, Slaughter, and Goff concur.

---

[1] We held oral argument in Anderson at Anderson University. We thank the university for its outstanding hospitality; the parties for their travel and excellent advocacy; and the students from Anderson Christian School, Anderson University, Burris Laboratory School, Daleville Junior-Senior High School, The Excel Center of Anderson, Indiana Christian Academy, Inspire Academy: A School of Inquiry, Lapel High School, Liberty Christian School, Muncie Central High School, Tri Central Middle-High School, Wapahani High School, and Wes-Del High School for their respectful attention and insightful questions.

**Rush, Chief Justice.**

As technology advances, what was once the stuff of science fiction may enter the canon of constitutional law. Illustrating this in *Carpenter v. United States*, 585 U.S. ----, 138 S. Ct. 2206 (2018), the Supreme Court of the United States addressed a question concerning cell phone location information: When the State accesses a person's historical cell-site location information (CSLI), has the State conducted a search under the Fourth Amendment?

The Court's answer: generally, yes. *Carpenter* made clear that seven days' or more worth of CSLI accessed constitutes a search—and also left open the possibility that accessing even fewer days of CSLI could constitute a search. This means that the State generally must obtain a warrant before procuring a person's CSLI.

When it decided *Carpenter*, the Court also granted certiorari in the case before us, vacated our prior decision, and remanded the case to us for reconsideration in light of *Carpenter*. We ordered supplemental briefing and oral argument.

We now hold that accessing Marcus Zanders's CSLI was a Fourth Amendment search under *Carpenter*, but even if the CSLI evidence should have been excluded, the error was harmless beyond a reasonable doubt. We thus affirm Zanders's convictions.

# Facts and Procedural History

In the winter of 2015, police were investigating two armed robberies that had occurred less than one week apart at liquor stores in Dearborn County, Indiana.

The first one occurred around 9:17 p.m. on Saturday, January 31, at Whitey's Liquor Store in Lawrenceburg, Indiana. A lone, masked man entered the store and pointed a black handgun at the store clerk, Kenny Butler. The man demanded cash from the register; Newport cigarettes; Patrón tequila; and the store's phone, which he ripped apart. He ordered Butler to lie on the floor, and then left.

The second robbery occurred the following weekend at J & J Liquor in Dillsboro, Indiana. Around 9:26 p.m. on Friday, February 6, a lone, masked man entered the store and pointed a black handgun at the store's two clerks, Danielle Pruitt and Lisa Huddleston. He demanded cash from the registers and whatever phones they had in the store. He took the cash and phones, ordered the clerks to lie on the floor, went to the store's tequila section, and left. Once he was gone, the women noticed that a 1.75-liter bottle of "1800 Silver" tequila was missing from the liquor shelves.

As part of their investigations, police interviewed eyewitnesses and reviewed the security-camera video footage from each robbery. One witness, who lived across the street from J & J, had seen a man run away from the liquor store right after the robbery, with a bottle tucked under his arm. The witness watched the man hop into a red Pontiac G6 and drive away.

Also talking with Pruitt on the night of the J & J robbery, the police learned that shortly before the store was robbed, Pruitt had answered a phone call—someone asking when the store would close that night. She noticed that the call came from an Ohio number, which she supplied to police using the caller-ID function on J & J's phone.

The next morning, police plugged that phone number into Facebook's search function. The search returned a profile picture and account page for "Marcus Zanders." Posted on that page were photos and a video that had been uploaded using the phone that had called J &J and that was linked to the Facebook page. Those posts included photos of piled cash and a bottle of Patrón (posted the day after the Whitey's robbery), and a video of piled cash and a 1.75-liter bottle of 1800 Silver tequila (posted the morning after the J & J robbery).

Based in part on this information, Indiana police enlisted Ohio law enforcement officers for help locating Marcus Zanders. They also submitted an "Emergency Request Form" to Sprint, asking for GPS location information and "Call Detail Records WITH Cell Sites (last 30 Days)" for the phone number that called J & J and that was linked to the Marcus Zanders Facebook account. On the form, police provided a brief explanation of the emergency as "multiple state armed robber w[ith]

handgun displayed," because they suspected the Dearborn County robberies were connected to a robbery in Kentucky. The request was transmitted to Sprint by 1:57 p.m. on February 7, about sixteen-and-a-half hours after the J & J robbery.

About two minutes later, at 1:59 p.m., Ohio police spotted and began to surveil a red Pontiac G6 near Zanders's mother's apartment in Cincinnati. The vehicle was registered to Zanders's mother, Michelle. Zanders got out of the car at the apartment and went inside. He then returned to the car and drove away. The officers soon stopped Zanders for a traffic violation and arrested him for operating a vehicle without a valid license. When arrested, Zanders had on his person a cell phone with the number that called J & J and that was connected to the Marcus Zanders Facebook account.

The same day, Sprint supplied the requested phone records, including the historical CSLI; and police soon obtained warrants to search the two residences where Zanders was staying: his mother's and his brother's. Searching those residences, police found clothing and other items (cash, Patrón, 1800 Silver tequila, a black handgun) corresponding to those involved in the Whitey's and J & J robberies.

The State charged Zanders with two counts of robbery with a deadly weapon—one for the Whitey's robbery, and one for the J & J robbery—and two counts of unlawful possession of a firearm by a serious violent felon. At a jury trial, the State sought to present the Sprint CSLI records, along with a police officer's testimony about those records. The court admitted the evidence over Zanders's objection.

The jury found Zanders guilty of all four counts. He appealed his convictions, arguing in part that the State's warrantless procurement of his CSLI records violated his rights under the Fourth Amendment and under Article 1, Section 11 of the Indiana Constitution, and that the admission of the CSLI evidence was reversible error.

We rejected Zanders's arguments and affirmed the convictions. *Zanders v. State*, 73 N.E.3d 178 (Ind. 2017), *vacated by Zanders v. Indiana*, 138 S. Ct. 2702 (2018). On the Fourth Amendment issue, we reasoned that—in the

absence of clarification from the Supreme Court of the United States, and in line with the majority of federal circuits to have addressed the question at the time[2]—the third-party doctrine applied to CSLI.[3] *Id.* at 185. So State access of historical CSLI was not a Fourth Amendment "search," and the State did not need a warrant to access the CSLI records. *Id.* On the state constitutional issue, we found no violation because the police conduct was reasonable under the totality of circumstances. *Id.* at 186.

Zanders petitioned the Supreme Court of the United States for a writ of certiorari, based on our Fourth Amendment decision. While his petition was pending, the Supreme Court decided *Carpenter*, which established that police access to historical CSLI—certainly when seven days' worth or more is accessed, and possibly when fewer days' worth is accessed—is a search under the Fourth Amendment; the third-party doctrine does not apply. *Carpenter*, 138 S. Ct. at 2217 & n.3, 2220. So unless the search falls under an exception to the Fourth Amendment's warrant requirement, the State must obtain a warrant before accessing the CSLI. *See id.* at 2222–23.

Having decided *Carpenter*, the Supreme Court granted Zanders's petition for certiorari, vacated our decision based on the Fourth Amendment, and remanded the case to us for reconsideration in light of *Carpenter*. We ordered additional briefing and oral argument, and now address the parties' arguments.

---

[2] *Compare United States v. Graham*, 824 F.3d 421 (4th Cir. 2016) (en banc); *United States v. Carpenter*, 819 F.3d 880 (6th Cir. 2016), *rev'd*, 585 U.S. ----, 138 S. Ct. 2206 (2018); *United States v. Davis*, 785 F.3d 498 (11th Cir. 2015) (en banc); *In re Application of U.S. for Historical Cell Site Data*, 724 F.3d 600 (5th Cir. 2013), *with In re Application of U.S. for an Order Directing a Provider of Elec. Commc'n Serv. to Disclose Records to the Gov't*, 620 F.3d 304 (3d Cir. 2010). The Second and Tenth Circuits joined the majority position after we issued our opinion. *See United States v. Thompson*, 866 F.3d 1149 (10th Cir. 2017); *United States v. Ulbricht*, 858 F.3d 71 (2d Cir. 2017).

[3] The third-party doctrine recognizes that "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Smith v. Maryland*, 442 U.S. 735, 743–44 (1979). This means "the Government is typically free to obtain such information from the recipient without triggering Fourth Amendment protections." *Carpenter*, 138 S. Ct. at 2216.

Zanders argues that in light of *Carpenter*, the CSLI records and testimony should have been excluded, and this Court should vacate his convictions and remand for a new trial.[4]

The State argues that *Carpenter* does not require reversal for a new trial, and that Zanders's convictions should be affirmed. The State reasons that, unlike in *Carpenter*, exigent circumstances here justified the warrantless search of the CSLI; and, even if a warrant was required, the admission of CSLI was harmless beyond a reasonable doubt.

# Standard of Review

We review decisions to admit or exclude evidence for abuse of discretion affecting the defendant's substantial rights. *See United States v. Rainone*, 816 F.3d 490, 497 (7th Cir. 2016); *Williams v. State*, 43 N.E.3d 578, 581 (Ind. 2015). Here, whether the trial court abused its discretion by admitting the CSLI evidence depends on a legal determination, which we review de novo. *See United States v. Figueroa-Espana*, 511 F.3d 696, 701 (7th Cir. 2007); *McIlquham v. State*, 10 N.E.3d 506, 511 (Ind. 2014). We will conclude that a constitutional error resulted in prejudice unless we are "able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967).

# Discussion and Decision

We first address whether the State's access to CSLI for Zanders's phone was a Fourth Amendment search under *Carpenter*. Deciding that it was,

---

[4] He also urges us to reconsider his state constitutional claim. We decline to revisit our state constitutional holding, as our analysis under Article 1, Section 11 of the Indiana Constitution does not depend on the Fourth Amendment, *see Zanders*, 73 N.E.3d at 185–86; *Wright v. State*, 108 N.E.3d 307, 315 (Ind. 2018); *Litchfield v. State*, 824 N.E.2d 356, 359–60 (Ind. 2005), and our finding of harmlessness beyond a reasonable doubt would preclude relief on the state constitutional claim even if we were to find a violation, *see Torres v. State*, 673 N.E.2d 472, 474–75 (Ind. 1996) (reviewing state constitutional error for harmlessness beyond a reasonable doubt).

we next apply harmless-error analysis to the admission of the CSLI evidence. We conclude that even if admitting the CSLI evidence was error, it was harmless beyond a reasonable doubt. So we affirm Zanders's convictions.

## I. The State's Access to Zanders's CSLI Was a Fourth Amendment Search.

On appeal, we "appreciate[d] both sides of th[e] federal split" over whether government access to historical CSLI is a Fourth Amendment search. *Zanders*, 73 N.E.3d at 185. And in the absence of Supreme Court precedent resolving the split, we "align[ed] with the majority position," affirming the trial court's ruling that individuals do not have a reasonable expectation of privacy in their CSLI, given the application of the third-party doctrine. *Id.*

But in resolving the split, the Supreme Court in *Carpenter* instructed otherwise. Although *Carpenter* specifically addressed the government's receipt of over 125 days of CSLI, the Court held that an individual has a reasonable expectation of privacy in seven days or more of CSLI, which provides a comprehensive chronicle of the user's past movements. 138 S. Ct. at 2211, 2217 & n.3. The 30 days of Zanders's historical CSLI at issue here was therefore a Fourth Amendment search under *Carpenter*.

Concluding that a "search" under the Fourth Amendment occurred is just the first step of our analysis, for three reasons. First, the Fourth Amendment does not always require a warrant before conducting a search—exigent circumstances, for example, may supply an exception to the warrant requirement. *See id.* at 2221–23. Second, even if the search was unconstitutional, the exclusionary rule may not apply, making the fruits of the search admissible. *See Davis v. United States*, 564 U.S. 229, 236–37 (2011); *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) ("Suppression of evidence . . . has always been our last resort, not our first impulse."). And, finally, if evidence should have been excluded but its admission was

harmless beyond a reasonable doubt, the error does not require reversal. *See Chapman*, 386 U.S. at 24.[5]

On these points, the State argues that exigent circumstances made the warrantless search reasonable—and thus constitutional under the Fourth Amendment—so there was no error in admitting the CSLI evidence. The State continues that even if the evidence should have been excluded, admitting it was harmless beyond a reasonable doubt.

Zanders responds that exigent circumstances did not justify the warrantless search of his CSLI; the fruits of that search should have been excluded; and their admission was not harmless error.[6]

We need not, and do not, decide whether exigent circumstances justified the warrantless search. This is because, in view of the whole record, the CSLI evidence was harmless beyond a reasonable doubt.

---

[5] At oral argument, Zanders's counsel repeatedly emphasized that the Supreme Court of the United States considered this case on the merits and that the Court's order granting, vacating, and remanding the case both includes "an implication maybe that the United States Supreme Court didn't believe exigent circumstances existed," and ultimately "tells us that clearly Marcus Zanders's Fourth Amendment rights were violated, as in *Carpenter*." We agree that the Supreme Court of the United States granted, vacated, and remanded this case on consideration of the parties' submissions and that *Carpenter* abrogated the third-party-doctrine analysis on which our prior Fourth Amendment decision relied. But we do not read the Court's order as having decided the merits of these issues.

[6] He also argues that the State waived its harmless-error argument. For two reasons, we review the alleged constitutional error for harmlessness regardless of waiver. First, prejudice is generally part of our review standard, *Rainone*, 816 F.3d at 497; *Williams*, 43 N.E.3d at 581, so to the extent the alleged constitutional error may afford Zanders a new trial, we must determine whether he is entitled to that relief. *Cf.* Ind. Trial Rule 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."). Second, errors in admitting evidence from an unconstitutional search are subject to harmless-error analysis because we have an interest in securing justice without unnecessarily expending judicial resources. *Arizona v. Fulminante*, 499 U.S. 279, 306–08 (1991) (citing *Chambers v. Maroney*, 399 U.S. 42, 52–53 (1970)); *see Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986); *Chapman*, 386 U.S. at 23–24. For the same reasons harmless-error analysis applies to constitutional errors generally, we review the alleged constitutional error for harmlessness even if the State's harmlessness argument is waived. *See generally Chapman*, 386 U.S. 18; *Durden v. State*, 99 N.E.3d 645, 652 & n.7 (Ind. 2018).

## II. The Admission of CSLI Evidence Was Harmless Beyond a Reasonable Doubt.

Not all constitutional errors are subject to harmless-error standards. *See Chapman*, 386 U.S. at 23 & n.8 (providing examples); *Arizona v. Fulminante*, 499 U.S. 279, 309–10 (1991) (same).

But most are, including the admission of evidence obtained in violation of the Fourth Amendment. *Fulminante*, 499 U.S. at 306–07 (citing *Chambers v. Maroney*, 399 U.S. 42, 52–53 (1970)); *United States v. Stefonek*, 179 F.3d 1030, 1036 (7th Cir. 1999). For these errors, "an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986). Put another way, the question is, "Is it clear beyond a reasonable doubt that . . . [the] jury would have found the defendant guilty absent the error?" *Neder v. United States*, 527 U.S. 1, 18 (1999).

The State bears the burden to make this showing. *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1907 (2017); *Chapman*, 386 U.S. at 24. And it is a heavy burden indeed. But overcoming this burden does not require showing that the jury was "totally unaware of that feature of the trial later held to have been erroneous." *Yates v. Evatt*, 500 U.S. 391, 403 (1991), *disapproved of on other grounds by Estelle v. McGuire*, 502 U.S. 62, 72 n.4 (1991); *see Neder*, 527 U.S. at 18 ("To set a barrier so high that it could never be surmounted would justify the very criticism that spawned the harmless-error doctrine in the first place . . . ."). Rather, the reviewing court must "find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *Yates*, 500 U.S. at 403.

The harmless-error doctrine thus serves two key, interrelated functions: it "recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence," *Van Arsdall*, 475 U.S. at 681 (citing *United States v. Nobles*, 422 U.S. 225, 230 (1975)), and it "promotes public respect for the criminal process by

focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error," *id.*

For these reasons, harmless-error analysis involves quantitatively and qualitatively assessing the error in the context of other evidence presented. *See id.* at 684; *Fulminante*, 499 U.S. at 307–08. This analysis requires us to first identify the allegedly improper evidence, then evaluate its significance in view of all the other evidence that was properly presented. *See, e.g., United States v. Hasting*, 461 U.S. 499, 510–12 (1983); *United States v. Watts*, 453 F. App'x 309, 312–14 (4th Cir. 2011); *United States v. Tenerelli*, 614 F.3d 764, 769–70 (8th Cir. 2010).

## A. If the State Obtained the CSLI Illegally, Only the CSLI Records and Corresponding Testimony Would Have Been Excluded.

The parties agree that if the State violated Zanders's constitutional rights by obtaining the CSLI without a warrant, the CSLI records from Sprint, and corresponding testimony about them,[7] should have been excluded. But they disagree about whether the evidence police obtained by executing the search warrants for Zanders's residences should also have been excluded.

Zanders argues that the search warrants relied on the CSLI search, so evidence obtained by their execution is inadmissible as fruit of the poisonous tree. The State disagrees, as do we.

Even if the State obtained the CSLI illegally and the search warrants were accordingly defective, the good-faith exception to the exclusionary rule applies to the officers' objectively reasonable reliance on those warrants. This good-faith exception stems from the exclusionary rule's aim to deter unlawful police conduct. *See United States v. Leon*, 468 U.S. 897, 920–21 (1984). When an officer acting with objective good faith has

---

[7] This includes the demonstrative exhibits Officer Carl Pieczonka used to explain the CSLI records.

obtained a search warrant from a judge or magistrate, "there is literally nothing more the policeman can do in seeking to comply with the law" other than to act within the warrant's scope. *Id.* at 921 (quoting *Stone v. Powell*, 428 U.S. 465, 498 (1976) (Burger, C.J., concurring)). So "[p]enalizing the officer for the magistrate's error . . . cannot logically contribute to the deterrence of Fourth Amendment violations." *Id.* Accordingly, evidence obtained in good-faith, reasonable reliance on a warrant is admissible.

But the good-faith exception does **not** apply if the officer had no reasonable grounds for believing that the warrant was properly issued. *Id.* at 922–23. This happens, for example, when the officer–affiant has misled the magistrate who issued the warrant, using information in an affidavit that the affiant knew was false; or when the officer has relied "on a warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Id.* at 923 (quoting *Brown v. Illinois*, 422 U.S. 590, 610–11 (1975) (Powell, J., concurring in part)); *see also id.* (providing other situations in which the good-faith exception does not apply).

Here, the good-faith exception applied: the officers had reasonable grounds for believing that the warrants were properly issued. When the officers applied for and obtained the warrants to search the residences, they did not have the benefit of *Carpenter* or other precedent establishing that the Fourth Amendment generally requires a warrant before police may access CSLI. In fact, the weight of authority at the time suggested the opposite—that no warrant was required. Although officers must have reasonable knowledge of what the law requires and prohibits, we do not expect them "to engage in extensive legal research and analysis before obtaining search warrants," much less anticipate redirection of the weight of authority on an issue. *State v. Spillers*, 847 N.E.2d 949, 958 (Ind. 2006); *see also Leon*, 468 U.S. at 922 n.23 (identifying the question as "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization"); *United States v. Koerth*, 312 F.3d 862, 869 (7th Cir. 2002) ("Police officers in effecting searches are charged with a knowledge of well-established legal principles as well as an ability to apply the facts of a particular situation to these principles."

(quoting *United States v. Brown*, 832 F.2d 991, 995 (7th Cir. 1987))). So the police could reasonably presume the warrants were valid.

This is true even if the warrants—without the CSLI information in the affidavits—were unsupported by probable cause. In that case, each warrant was still not so facially deficient that executing officers could not reasonably presume it to be valid. *See Leon*, 468 U.S. at 923. The affidavits supplied enough probative information—about the stolen property (cash, Patrón, 1800 Silver tequila); the telephone number that called J & J and that was tied to Zanders's Facebook page; the Facebook postings of money, Patrón, and 1800 Silver tequila on Zanders's account just hours after the robberies; the witnesses' descriptions of the robber and Pontiac G6; and more—so that each affidavit was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," *id.* (quoting *Brown*, 422 U.S. at 611). And when the police executed each search, they did not exceed the scope of either warrant.

Since the good-faith exception applies to the officers' searches of the two residences, the evidence obtained from those searches was properly admitted, irrespective of the CSLI language in the affidavits. For the harmless-error analysis, then, that evidence is part of "everything else the jury considered on the issue in question," *Yates*, 500 U.S. at 403.

Finally, also included in the pool of properly admitted evidence are the phone records from Sprint indicating numbers dialed from Zanders's phone, without the CSLI. *See Smith v. Maryland*, 442 U.S. 735, 743–44 (1979). *Carpenter* did not revoke the third-party doctrine's application to those kinds of phone records that are admissible under *Smith*. *Carpenter*, 138 S. Ct. at 2220.

Having identified which evidence should have been excluded if the warrantless search of Zanders's CSLI violated his Fourth Amendment rights, we now assess whether that evidence's admission was harmless.

## B. In View of the Whole Record, It Is Clear Beyond a Reasonable Doubt that the Jury Would Have Returned the Same Verdict Absent the Error.

Whether an error in admitting evidence was harmless in a particular case depends on a host of factors. They include the presence or absence of other, corroborating evidence on material points; whether the impermissibly admitted evidence was cumulative; the overall strength of the prosecution's case; the importance of the impermissible evidence in the prosecution's case; and the extent of cross-examination or questioning on the impermissibly admitted evidence. *See, e.g.*, *United States v. Job*, 871 F.3d 852, 865–67 (9th Cir. 2017); *United States v. Russian*, 848 F.3d 1239, 1248–50 (10th Cir. 2017); *United States v. Bailey*, 743 F.3d 322, 342–45 (2d Cir. 2014); *Rabadi v. State*, 541 N.E.2d 271, 276–77 (Ind. 1989); *cf. Van Arsdall*, 475 U.S. at 684.

Considering each of these factors in view of the whole record, we can confidently declare, beyond a reasonable doubt, that the CSLI evidence did not contribute to the jury's guilty verdicts.

### 1. The State Presented Other Corroborating Evidence on the Material Point that Zanders Went Near Each Robbery.

For the jury to find Zanders guilty, the State needed to prove that Zanders, while armed with a deadly weapon, knowingly or intentionally took property from another person through force or threat of force; or by putting any person in fear. Ind. Code § 35-42-5-1 (2014). It was undisputed that all the elements of armed robbery were met by the masked man at each liquor store. The security-camera videos and the victims' testimony irrefutably established that the man took property from each store's clerks by pointing a handgun at the employees, threatening force or placing the employees in fear. All that remained was to prove that Zanders was the man behind the masks.

The CSLI evidence went only to this element. And it was probative because it indicated that Zanders's phone moved from cell-service areas in

Cincinnati to cell-service areas covering each Indiana liquor store around the time it was robbed.

But the State amassed a pile of other—and weightier—evidence on this point. While the CSLI could demonstrate only that Zanders went **near** the robberies, the remaining evidence strongly tended to place Zanders **at** the liquor stores as the robber who pointed the gun at the employees and took the cash, alcohol, cigarettes, and phones. *See* Black's Law Dictionary 674 (10th ed. 2014) (defining "corroborating evidence" as "[e]vidence that differs from but strengthens or confirms what other evidence shows (esp. that which needs support)").

We'll recount this multitude of corroborating, non-CSLI evidence by addressing each robbery in turn. But before we do, it is important to recognize that the evidence of Zanders's guilt for each robbery is also evidence of his guilt for the other. This is because the State presented strong evidence that the robber of Whitey's was also the robber of J & J.

First, the robbed liquor stores were near each other, and the robberies occurred within a short time frame. Specifically, both liquor stores are in the same county, which borders the Indiana–Ohio state line near Cincinnati, where Zanders was living. The stores sit only about 10–15 miles apart, along US-50; the local jury would have been familiar with the area. And the robberies were committed less than one week apart, on consecutive weekends, at the same time of night (between 9:15 and 9:30 p.m.).

Second, the Whitey's robber and J & J robber shared characteristics. The size and build of the Whitey's robber were similar to, if not indistinguishable from, the size and build of the J & J robber. And each robber was alone, wearing a cloth mask, a hooded sweatshirt, black gloves, and carrying only a black handgun.

Third, the robberies followed the same pattern: Zanders's cell phone number called the liquor store in the evening, before the robbery. Then, the robber entered the store and immediately held his right arm straight out, pointing the gun at the store clerk(s). He demanded cash from the register(s), told the clerk(s) to give him the available phones (which he

took or ripped apart), and removed tequila from the store. He instructed the clerk(s) to lie on the floor and placed his gun in or near his pants or his sweatshirt pocket before he left.

Finally, other evidence strongly linked the two robberies as being committed by the same person. The 40-caliber handgun found at one of the residences where Zanders was staying had a size, shape, and color that made it indistinguishable from the handgun depicted in both stores' security videos. For each robbery, there was evidence that a red Pontiac G6—the kind of car Zanders was driving upon arrest—was involved. When police searched the two residences where Zanders was staying, the clothing and other items corresponding to each robbery were commingled. And most compelling of all, the pictures and video showcasing items corresponding to the stolen property were posted on the same Facebook page—Zanders's—the day after each robbery, by him, the account holder. The photo posts were mobile uploads, tied to the phone number—Zanders's—that had called each liquor store shortly before it was robbed.

Thus, given the similar characteristics between the two robberies, the non-CSLI evidence that Zanders was the masked man in one robbery is also evidence that he was the masked man in the other. And while the CSLI could, at best, show that Zanders went **near** the robberies, the other evidence made a stronger showing: that Zanders was **at** the robberies, as the actual robber. We now turn to each individual robbery and the corresponding non-CSLI evidence.

### a. Whitey's Robbery

For the Whitey's robbery, the admissible evidence included the following: security-camera videos of the robbery, taken from inside Whitey's; testimony from the victimized clerk, Kenny Butler; clothing and other items, found where Zanders was staying, corresponding to clothing and items involved in the robbery; call records for Zanders's phone, revealing someone using his phone had called Whitey's the evening of the robbery, before it was robbed; screenshots of Zanders's Facebook page, which was linked to his phone number; photos uploaded from Zanders's

phone to his Facebook page; testimony from Tasha West, an eyewitness at the Gold Star Chili drive-through by Whitey's; security-camera videos from a store near Whitey's; testimony from investigating Officers Barry Bridges, Carl Pieczonka, Jeremy Shepard, Joshua Fey, Gregory Morgan, Paul Nabor, John Enderele, Dale Mikes, Wallace Lewis, and Jason Hubbard; photos of the red Pontiac G6 that Zanders was driving upon his arrest; and the video of Zanders's interview with Officers Bridges and Shepard.

Specifically, in the Whitey's security-camera videos, the jury could see the robber's size, build, clothing, and actions. He wore a dark hooded sweatshirt with a small, white, circular- or crescent-shaped emblem on the left chest; dark jeans; light brown work boots; black gloves, each with a design on the backside; and a white cloth mask that puckered out on one side of his face.

He entered through the front door; pointed a black handgun at Kenny Butler; and watched Butler place cash from the register, cigarettes, and Patrón tequila (two pint-sized bottles in green boxes) into a bag. The videos also show the robber placing his hands and gun on the service counter, right in front of Butler, and ripping apart the store's phone. They next display the robber moving his gun toward his waist or sweatshirt pocket as he exited the same door he entered. One video shows him walking to the left of the screen once he was outside, with his hood and face still covered.

Kenny Butler's description was consistent with the videos, and he supplemented that the design on the backside of the robber's gloves was the stylized "B" logo of the Cincinnati Bengals. He also said the robber's voice was deep and sounded to him like a black male's.

Officer Lewis, who investigated the robbery, testified that he used stills of the Whitey's surveillance video, along with reference points in the store, to estimate that the robber stood between 5'10" and 6', give or take an inch. Zanders's driving records list him in that range, at 6'1", and Officer Lewis testified that Zanders's height at booking was a little over 5'11".

Eyewitness Tasha West also testified. On the night Whitey's was robbed, she had gone through the drive-through at Gold Star Chili, which was two doors down from Whitey's, at the end of the same strip mall. She testified that when she was in the drive-through, she saw "a black gentleman walk across the front of our car. . . . And the reason why I looked at him was because he was acting weird with his pants," like something was in them. She said he was wearing dark jeans and a dark hooded sweatshirt, and his hair was "right by his scalp"—not long—kind of like small cornrows or dreadlocks. He didn't have anything covering his face, so she could see it—the side of his face—as "he walked right in front of [her]" in a direction away from the liquor store.

West also testified that the following week, she saw a media story with video footage of a man walking. Because of the camera's angle, West saw him "walk directly in front of the camera and it was just like sitting in my car watching him walk across the street, or across, in front of my car." His hair might have been a little different, but because of his unique walk and the video's view of his face and body, West had no doubt that he was the person she saw walk right in front of her in the drive-through. The man in the video was identified as Marcus Zanders.

The State also presented evidence that Zanders was at a United Dairy Farmers store near Whitey's shortly before the robbery. The robbery occurred at about 9:17 p.m. A United Dairy Farmers store employee had told Officer Shepard that around 9:00 p.m., a black male entered the store and asked for directions to Whitey's. Video footage from an outdoor security camera shows a red car—which Officer Shepard believed was a Pontiac G6—driving in the store's parking area at about 8:59 p.m. Another video, from inside the store, reveals that shortly after 9:00 p.m., a man resembling Zanders—in size, build, hair, complexion, and facial features—entered and then left a few minutes later.

Evidence from Facebook and from Zanders's residences provided stronger evidence. Officer Pieczonka supplied screenshots of Marcus Zanders's Facebook page. Those screenshots revealed that the page was connected to Zanders's phone number, which call records indicated had called Whitey's before the robbery that evening. Again, these are records

of calls made and received—not including CSLI. One of the screenshots displayed a mobile-upload photo, posted the day after the Whitey's robbery, of a pint bottle of Patrón like the ones stolen from Whitey's, and captioned, "You want some."

When police searched the two residences where Zanders was staying, they found—alongside a casino rewards card embossed with "Marcus Zanders"—the following items corresponding to clothing and other items involved in the robbery: a black glove with an orange and black Bengals "B" logo on the backside; a white mesh mask that was irregularly shaped, bunching in some places; a Newport cigarette box with an Indiana tax stamp on it; a dark blue hooded sweatshirt with a small, white, crescent-shaped "Champion" logo on the left chest; light brown work boots; cash; two pint bottles of Patrón, along with at least one green packaging box; and a 40-caliber black handgun, which Officer Shepard testified was the same as the one displayed in the security videos.

Finally, Zanders told police that he smokes Newport cigarettes and that one of the drinks he prefers is Patrón—and Newport cigarettes, along with two bottles of Patrón and cash, were stolen from Whitey's.

This pool of evidence corroborates the CSLI evidence that Zanders was near the robbery. Ultimately, though, the non-CSLI evidence is even stronger, showing that Zanders had been **inside** Whitey's and was the person caught on tape robbing the store. This point, again, was further corroborated by the non-CSLI evidence that Zanders was guilty of the J & J robbery—which is examined in detail below.

### b. J & J Robbery

Compared to its case for the Whitey's robbery, the State presented even more and stronger non-CSLI evidence that Zanders was the masked man who robbed J & J.

That non-CSLI evidence included the following: several security-camera videos of the robbery, taken from inside J & J; videos of the J & J parking lot area; testimony from the two victimized clerks, Danielle Pruitt and Lisa Huddleston; clothing and other items, found where Zanders was

staying, corresponding to clothing and items involved in the robbery; call records for Zanders's phone, revealing the phone had been used to call J & J shortly before the robbery; screenshots of Zanders's Facebook page, which was linked to his phone number; photos uploaded from Zanders's phone to his Facebook page; a nearly identical photo pulled from Zanders's phone; video uploaded by Zanders to his Facebook page the morning after the robbery; testimony from eyewitness Kelly Curry, who lived at the Maple Glen Apartments across from J & J; phones stolen from J & J found by the Maple Glen Apartments; testimony from J & J owner Renee Wilson, about her 1800 Silver tequila inventory and pricing practices; testimony from John Montgomery, the general manager of Proximo, a distributor of 1800 Silver tequila; testimony from investigating Officers Bridges, Pieczonka, Shepard, Fey, Hubbard, Morgan, Nabor, Enderele, Ed Lewis, and Mikes; photos of the red Pontiac G6 that Zanders was driving; and the video of Zanders's interview with Officers Bridges and Shepard.

The video cameras inside J & J captured the robbery as it unfolded. Upon entering, the robber pointed a black handgun at the two clerks. He wore gray sweatpants; a gray, hooded, zip-up sweatshirt with the hood up; white-and-black athletic shoes; black gloves; and a black mask. As the clerks put cash from the registers into a bag, the robber grabbed one clerk's cell phone and the store's cordless phones from the counter. The clerks lay on the floor, and the robber moved his gun to his waistband as he walked to some shelves. He departed, carrying a blue-tinted object in his arm.

Pruitt and Huddleston provided more details in their testimony. Pruitt said the robber's black mask "looked like a toboggan." Huddleston saw that on his sweat pants was a small navy blue Polo horse symbol, which she noticed while she was lying on the floor. The clerks explained that before exiting, the robber had walked to the liquor section, where tequila was shelved. And after he left, an 1800 Silver bottle of tequila—which has a large blue label—was missing from those shelves. The clerks could tell because they had just "faced" the shelves—a routine of bringing bottles to the front of the shelves so that no empty spaces face the customers—and

there was an empty spot where an 1800 Silver bottle had been before the robbery.

The security-camera videos outside J & J provided additional evidence, giving the jury a view of the robber before and after the robbery. Before the robbery, at about 9:26 p.m., the masked, hooded figure in gray sweats walked across the parking lot toward J & J, from the direction of the Maple Glen apartments. He entered J & J, then a few minutes later exited the same door with something in his arm. He next walked, then jogged, away from J & J and toward the Maple Glen apartments.

Kelly Curry's testimony picked up the narrative from there. At about 9:30 p.m., she was smoking a cigarette outside, on her third-floor balcony at the Maple Glen apartments, when she saw a man dressed in an all-gray sweat suit, hood pulled up, run around her building. He came close to the building, running on the grass area, and he was carrying what looked like a bottle tucked under his arm. He ran directly to a red Pontiac G6, hopped in, and took off. He was alone. About five minutes later, Curry saw police cruisers arrive at J & J, and she flickered her balcony lights on and off to get the officers' attention and tell them what she had seen. Police found the stolen phones in a grassy area next to the Maple Glen apartments.

One of the clerks testified that before the robbery, she had received a call on the J & J phone from an Ohio number—someone asking what time the store closed that night. She told Officer Bridges about that call when he responded to the robbery that night, and she gave him the phone number using the caller-ID function of J & J's phone.

The next morning, Officer Pieczonka put that number into Facebook's search function. He discovered that the number was linked to the Facebook account of "Marcus Zanders."

Screenshots of Officer Pieczonka's view displayed the Facebook search result, parts of Marcus Zanders's profile page, and some of the account's mobile-upload posts. The profile page stated that Marcus Zanders lives in Cincinnati, Ohio, and is self-employed. The mobile-upload posts indicated they had been uploaded around 5:00 a.m. and 11:30 a.m. that morning— the morning after the robbery—from a location near the address where

Zanders was staying. The photos depicted cash—in $1, $5, $10, $20, and $100 bills—piled on what looks like the floor and a bed.

One photo, captioned "Getting money while being," exhibits cash sitting on what looks like red plastic or cloth on a bed. When Officer Mikes searched Zanders's phone, he found a picture nearly identical to that photo. The phone's time stamp indicated the photo was taken using the phone's camera, on February 7 at 4:15 a.m. the morning after the J & J robbery.

A video was also posted to the Facebook page by Marcus Zanders—the account holder—the morning after the robbery. It begins with a close-up view of a large 1800 Silver tequila bottle (displaying its prominent blue label) with a small white rectangle centered near the top, sitting on a counter. It then pans to cash on the counter, then into another room, to a mound of cash on a bed, along with what looks like red plastic or cloth.

Zanders acknowledged the Facebook posts in his interview, and affirmed that he had his phone on him the whole evening, night, and early morning of February 6–7. He also indicated that during the couple of days before February 6, the most money he had was $40 to $50. But, he said, he had gone to a casino from 5:30 a.m. to 7:30 a.m. on February 7, and while he was there, he had won $575. He said the Facebook posts that the officers had seen were of his winnings and his mother's rent money, which was $255. The interview included this interchange:

> Officer Shepard: Marcus, you've got--you've got a Facebook page, right?
>
> Zanders: [nods]
>
> Officer Shepard: Alright. Last night, you're posting on your account. You got a large sum of money on your bed.
>
> Zanders: Yeah, from uh…the casino.
>
> Officer Shepard: That was a lot more than $575.

> Zanders: That…ay what you seen hella singles, and my
> momma's rent money.

Indeed, more than $500-worth of bills are depicted in the Facebook photos and video, including at least four $100 bills. But at least one post depicting those hundreds of dollars—the post that was nearly identical to the photo taken using Zanders's phone camera at 4:15 a.m.—had been posted around 5:00 a.m., before the time Zanders said he'd left for the casino, discrediting his account of how and when he acquired the money.

Further, when police searched Zanders's mother's and brother's apartments, they found a host of inculpatory items. In addition to the items corresponding to the Whitey's robbery, they found the casino rewards card embossed with "Marcus Zanders"; cash; a gray, hooded, zip-up sweatshirt; gray Polo sweatpants with a small horse symbol on them; and the 40-caliber handgun. A still photo from the J & J security video gives a clear view of the black handgun that the robber pointed at the clerks—the two are indistinguishable.

The police also found, on one of the kitchen counters, a 1.75-liter, blue-labeled 1800 Silver bottle with a small white price sticker centered near the top—just as the Facebook video depicted. Officer Pieczonka testified that he recognized the video was taken in that apartment, where Zanders said he was living. And Renee Wilson—owner of J & J Liquor—testified that she instructs her employees to place the price stickers straight and centered, like the one on the bottle police found in the apartment. She also priced J & J's 1.75-liter 1800 Silver tequila at $37.49, and noted that J & J's price-marking machine produces a faded "3." The price sticker on the bottle police found was $37.49, with a faded "3" typical of Wilson's pricing machine. Wilson demonstrated this for the jury, using one of J & J's five remaining bottles, which were depicted in photos of the crime scene.

Business records corroborated Wilson's testimony that she had ordered exactly six 1.75-liter 1800 Silver tequila bottles that year. None of those six bottles had been sold as of February 6, 2015, the day of the robbery. And all of them were on the shelf until the robbery; then one was missing. She

also explained that Southern Wine and Spirits, in Greenwood, Indiana, was Wilson's only source for that product.

Another set of business records and testimony confirmed that the bottle police found where Zanders was staying had gone to Southern Wine and Spirits before Wilson received it. The bottle was imprinted with a number. John Montgomery—General Manager of Proximo Distillers Indiana, a distributor owned by Jose Cuervo—explained that the number is a manufacturing batch lot code. The code, along with purchase-order numbers, indicated that after the tequila had been produced and bottled in Mexico by the sole manufacturer–bottler, Jose Cuervo, it was received and distributed by Proximo to Southern Wine and Spirits in Greenwood, Indiana.

Taken together, the non-CSLI evidence was vast, showing that Zanders not only went near the J & J robbery, but was the robber inside the store. And, as already explained above, this was further corroborated by the non-CSLI evidence that Zanders was guilty of the Whitey's robbery. We now turn to the cumulative nature of the CSLI evidence.

## 2. The CSLI Evidence Was Cumulative.

The non-CSLI evidence corroborating Zanders's proximity to the robberies also made the CSLI evidence cumulative. Cumulative evidence is evidence that "supports a fact established by the existing evidence," especially existing evidence that "does not need further support." Black's Law Dictionary 675 (10th ed. 2014); *see Turner v. United States*, 137 S. Ct. 1885, 1894–95 (2017); *Davis v. State*, 456 N.E.2d 405, 409 (Ind. 1983).

Again, the most the CSLI evidence could do was place Zanders near the liquor stores around the times they were robbed. At its strongest, then, that evidence was cumulative of other evidence establishing proximity to the robberies. To be sure, the sea of strong non-CSLI evidence that Zanders went inside and robbed Whitey's and J & J necessarily submerged the significantly weaker CSLI evidence that Zanders was near the crimes. *Cf. Humphrey v. State*, 73 N.E.3d 677, 686–87 (Ind. 2017) (concluding that improper admission of statement as evidence of guilt

was not cumulative because the "statement was the **only** evidence identifying [the defendant] as the shooter").

Having addressed the cumulative nature of the CSLI evidence, we turn to the overall strength of the State's case.

### 3. The State's Case Was Very Strong Without the CSLI Evidence.

Largely because the State's non-CSLI evidence was so voluminous and weighty, the State's case as a whole was very strong. True, not all the evidence was airtight. Zanders points to three discrepancies in the evidence, arguing that they "would have gravely concerned a jury asked to convict without the benefit of the [CSLI] evidence." None of these purported weaknesses, however, compromised the overall integrity or forcefulness of the State's case.

One of them is not a discrepancy at all; it is a misstatement of the record. Citing page 423 of the transcript, Zanders argues that the police estimated the height of the Whitey's robber between 5'6" and 5'10", and that Zanders's driving records list him outside that estimated range, at 6'1". But Zanders has misstated the transcript, which in fact provides that the police estimated the robber's height between 5'10" and 6', give or take an inch. Since Zanders's driving records list him at 6'1", and his book-in photo shows him at just over 5'11", both of these measures are within the range for the robber's estimated height. So the height estimation actually strengthens—not weakens—the State's case.

Zanders's second asserted discrepancy splits hairs to no avail. He points out that eyewitness Tasha West used the words "dreads or small corn rolls [sic]" when describing the hair of the man she saw cross in front of her car; and that Zanders's hair—at least in his BMV photo and at trial—lacked dreadlocks or cornrows, even if it was short.

Regardless of whether Zanders had the same hair style at the time of the Whitey's robbery, when his BMV photo was taken, and during trial, West explained that she couldn't be so specific to say that the man she saw indeed had dreadlocks or cornrows. She knew that his hair was short, not

long, and it "kind of looked like" small cornrows "right there at his scalp," but she didn't "even know what they're…like what it's called."

West's difficulty in naming the hair style did not shake her conviction about the man being the same person she saw in the news-story video. She testified that she had no doubt the man she saw cross in front of her vehicle was the person she saw in the video, who was identified as Marcus Zanders. Her sure recognition was not based on his hair; it was based on her view of the man's face and his distinct walk. So West's testimony provided significant weight to the State's case, notwithstanding her trouble describing hair.

The third purported discrepancy attempts to poke a hole in the evidence from the United Dairy Farmers store. Zanders says the red Pontiac in the store's video had a different number of wheel spokes, or "holes on the wheel cover," than Michelle Zanders's car had. At trial, this was one of a few points of contention concerning the evidence from the store. The others were that Zanders's mother and brother claimed the man in the surveillance video was not Zanders; and that the man's clothing in the video didn't match those displayed in the Whitey's robbery, though his white-and-black athletic shoes looked like those worn in the J & J robbery. The evidence from the United Dairy Farmers store was certainly not the strongest piece of the State's case. But even if that evidence provided minimal support to the State's case, it didn't weaken the other, more compelling evidence of Zanders's guilt, which was plentiful and forceful.

All in all, the State presented heaps of strong, non-CSLI evidence that Zanders was the person who committed both robberies. That evidence amounted to a compelling case, even without the CSLI evidence. This logically brings us to the next point—that the importance of the CSLI evidence was diminished by the non-CSLI evidence's strength.

### 4. In Light of the Other Evidence Presented, the CSLI Evidence Was Unimportant.

In light of the vast, strong non-CSLI evidence of Zanders's guilt, the CSLI evidence was unimportant to the State's case. If the jurors found the CSLI evidence reliable and comprehensible, then they may have understood it as indicating that Zanders was in the robberies' vicinity. But the other, convincing evidence that Zanders was the man committing the robberies inside the stores—not just nearby—drowned the import of the CSLI evidence.

The CSLI evidence did not pervade the trial. Rather, it was contained to a small portion of the State's presentation of its case—virtually all between mid-morning and lunch on the fourth (and final) day of trial. This limited scope is partly because of the trial court's decision to sustain Zanders's objections to the admission of testimony concerning the CSLI records until after the hearing on whether the CSLI records themselves would be admitted.

And even on the last day of trial, the CSLI evidence was largely confined to a single witness's testimony. The State called five witnesses on that day. The first three did not testify about CSLI at all. It's true that the third explained that in executing a warrant to search Zanders's phone, his report included the M.E.I.D., which "is specific to each phone and it tells the cell tower which phone it is to direct the call to." But he did not do any cell phone tower analysis, which is what generates CSLI.

After the mid-morning break, the fourth witness—Officer Pieczonka—testified about the CSLI records. The CSLI records were a large volume of spreadsheets, which Officer Pieczonka distilled into more comprehensible terms, and a large portion of his testimony was devoted to explaining how he made sense of the numerical data. His testimony and the records ultimately pointed to a conclusion that the phone had moved into cell-service regions covering the liquor stores' locations around the times they were robbed.

After lunch, the fifth witness said he obtained the records from Sprint, and he referred to the records' indication that Zanders was near the

robberies. But his testimony mostly focused on calls made by the phone—to friends and family of Zanders—to establish that the phone was Zanders's. While it's true that the CSLI evidence could not reveal Zanders's movements unless the phone was on his person, the CSLI evidence did not taint the evidence that the phone was the one Zanders used as his own.

Ultimately, while there was testimony that concluded, based on the CSLI evidence, that Zanders was nearby when the robberies were committed, more compelling evidence placed Zanders inside the liquor stores as the person committing the robberies—and rendered that CSLI evidence unimportant. In other words, the CSLI evidence was a drop in the evidentiary bucket, relative to Zanders's self-documented possession, shortly after both robberies, of piles of cash and bottles of tequila matching those stolen from the stores; his phone calls to the stores before the robberies; his use of a red Pontiac G6 matching the robber's getaway car; and the clothing and handgun that police found when executing the search warrants and that matched the surveillance videos of the robber.

Consistent with its relative insignificance, the State mentioned the CSLI evidence only in passing in opening and closing arguments—without repeatedly hammering it or orienting the State's case around it.

Zanders nevertheless argues that the CSLI evidence was important. He contends that "the State acknowledged that prior to the illegal search they didn't even have probable cause to arrest Zanders." In the portion of transcript Zanders quotes to support this argument, the prosecutor did say that they viewed the purpose of obtaining the CSLI records, and obtaining them quickly, as key to allowing them to get a warrant for his arrest. But Zanders's reliance on this statement suffers from at least three problems that make his argument unconvincing.

First, the statement was spoken outside the presence of the jury; it was part of the hearing on whether to admit the CSLI evidence. Certainly, a prosecutor's statements may suggest the importance of admitted evidence. But the jury must have heard the statement for it to have any impact on the verdict.

Second, Zanders misconceives the harmless-error inquiry. We acknowledge that the prosecutor did make similar statements to the jury in the opening statement and closing argument: in opening, that based on the information police gathered, including CSLI, they obtained search warrants for the two residences; and in closing, that "the Facebook was the first clue, then we got the cell phone tower locations. Then we had probable cause to do a search . . . ." But these statements go to the State's investigative process, not to the strength of the State's case without the CSLI evidence.

To be sure, the question is not whether the CSLI search was important for obtaining the warrants and evidence obtained from those warrants' execution. It is whether the CSLI evidence that was admitted, but should have been excluded, contributed to the jury's guilty verdicts. In other words, even if the CSLI search helped establish probable cause,[8] that doesn't mean the improperly admitted CSLI evidence was an important part of the case that the State presented to the jury. And, as we've already explained, even if the CSLI search contributed to the issuance of the warrants, the evidence obtained from the execution of those warrants was admissible under the good-faith exception.

Third, when read in context, the State's statements go toward its argument that exigent circumstances justified the warrantless search of CSLI. The State emphasized that "the purpose of obtaining those records and obtaining them quickly" was "because we had on the loose, someone who was an armed robber and as the request indicates he was a suspect and actually still is a suspect in some other robberies in the Tri-State area." So the statement was referring to the importance of obtaining the CSLI to address the exigency officers believed they faced. It was not referring to the importance of CSLI to establish Zanders's guilt beyond a reasonable doubt before a jury.

---

[8] As mentioned above, notwithstanding the prosecutor's appraisal of the CSLI's contribution to probable cause, the warrants may have been supported by probable cause without the reference to CSLI in the warrants' affidavits.

Thus, in light of the vast and weighty non-CSLI evidence presented to the jury, the CSLI evidence was neither a pervasive nor an important part of the State's case. This brings us to our final point: Zanders's counsel extensively cross-examined the CSLI evidence's proponent, calling attention to the evidence's weaknesses.

### 5. The CSLI Evidence Underwent Cross-Examination.

Although at its best the CSLI could indicate only that Zanders went near the liquor stores around the time each was robbed, Zanders's counsel scrutinized the evidence on cross-examination. He questioned the reliability of the technology, data, and Officer Pieczonka's analysis; and he illuminated possible alternative explanations for the CSLI data.

More specifically, when cross-examining Officer Pieczonka, counsel questioned how the officer could know that the phone was on Zanders's person. He also exposed that Officer Pieczonka did not know, and the records did not reveal, who had purchased the phone and subscribed to the cell service.

Counsel next brought to the jury's attention that Officer Pieczonka didn't know how many or where Sprint's cell towers were located in Cincinnati. Officer Pieczonka also agreed that whether a call bounces off any particular tower can be affected by firewalls inside a building, trees, the height of any particular tower, the types of buildings in that area, and the nature of the terrain in that area. Later, he acknowledged that the terrain in Cincinnati and Dearborn County includes hills, buildings, rough terrain, and foliage.

And, finally, Officer Pieczonka agreed with defense counsel that there's always faulty equipment, and the officer supposed that if something goes wrong with one tower, the signal could bounce off another one. Plus, he said that under "FCC guidelines . . . you can only have so much power going through these cell towers." Officer Pieczonka agreed that human error can be part of running any business, and the records did not name Marcus Zanders as the phone owner, nor did they otherwise associate

Zanders with the CSLI records; they identified the user only by the phone number.

In sum, this cross-examination called attention to the CSLI evidence's weaknesses—which, even at its strongest, was swamped by other, stronger evidence that Zanders was the man behind the mask in each robbery. For this reason and others elaborated above, the admission of CSLI evidence, if it was error, was harmless beyond a reasonable doubt.

## Conclusion

In light of the Supreme Court's decision in *Carpenter*, we hold that the State's access to Zanders's historical CSLI was a Fourth Amendment search. We also hold that, regardless of whether the search falls under the exigent-circumstances exception to the Fourth Amendment's warrant requirement, the admission of the CSLI evidence was harmless beyond a reasonable doubt. We therefore affirm Zanders's convictions.

David, Massa, Slaughter, and Goff, JJ., concur.

ATTORNEYS FOR APPELLANT
Leanna Weissmann
Lawrenceburg, Indiana

David M. Shapiro
Roderick & Solange MacArthur Justice Center
Northwestern Pritzker School of Law
Chicago, Illinois

Tony Walker
The Walker Law Group, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Curtis T. Hill, Jr.
Attorney General of Indiana

Stephen R. Creason
Chief Counsel

Tyler Banks
Deputy Attorney General
Indianapolis, Indiana